UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                          :
ERAN HIYA,                                                :
                                                          :
                              Petitioner,                 :
                                                          :                25-CV-05712 (JAV)
          -v-                                             :
                                                          :                OPINION AND ORDER
UNITED STATES OF AMERICA,                                 :
                                                          :
                              Respondent.                 :
                                                          :
------------------------------------------------------------------X

JEANNETTE A. VARGAS, United States District Judge:

On June 23, 2025, following an evidentiary hearing, Magistrate Judge

Jennifer E. Willis (the "Extradition Court") certified that Eran Hiya ("Hiya") is

extraditable under the Convention on Extradition Between the Government of the

United States of America and the Government of the State of Israel, U.S.-Isr., Dec.

10, 1962, 14 U.S.T. 1707, as amended by the Protocol Between the Government of

the United States and the Government of the State of Israel Amending the

Convention on Extradition Signed at Washington, D.C. on Dec. 10, 1962, U.S.-Isr.,

July 6, 2005, S. Treaty Doc. No. 109-3 (2005) (collectively, the "U.S.-Israel

Extradition Treaty"). *In re Extradition of Hiya*, No. 24-MJ-01971 (JW), 2025 WL

1730228, at *14 (S.D.N.Y. June 23, 2025).[1]

Hiya now petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2241

to prevent his extradition to Israel. ECF No. 27 ("Petition" or "Pet.") at 1, 13. Hiya

---

[1] The Court refers to this case as the "Extradition Case" and cites its docket entries as "Extradition Dkt. No."

argues that the Extradition Court lacked jurisdiction over him, and that the extradition request fails to establish probable cause that he committed the charged crimes.  For the reasons that follow, Hiya's Petition is **DENIED**.

## BACKGROUND

While the Court assumes the parties' familiarity with the underlying facts and procedural history as set out in the Extradition Court's June 23, 2025 decision, *see generally In re Extradition of Hiya*, 2025 WL 1730228, a brief recitation is necessary to resolve the instant Petition.

Hiya is a citizen of several countries, including the United States and Israel. *See* Extradition Dkt. No. 13-1 at 142.  He is alleged to be the leader of an Israeli crime syndicate and the mastermind behind a sophisticated plot to murder a rival gang leader, Eli Musli ("Musli"), on Israeli soil.  ECF No. 31 ("Opp'n") at 1-4; *see* ECF No. 31-1 at 142-56.

On April 11, 2024, the Government filed a criminal complaint in this District, charging Hiya with passport fraud and unlawful application for and attempted procurement of U.S. citizenship for his minor children, Extradition Dkt. No. 20-29, and obtained an arrest warrant based on that complaint, Extradition Dkt. No. 20-20.  At that time, the Malaysian police had custody of Hiya.  Extradition Dkt. No. 20-19, ¶¶ 4-5.  Hiya alleges that the Malaysian police took custody of his person under false pretenses at the instigation of the United States Government.  *See* Pet. at 2-10.

In or about April 2024, the Federal Bureau of Investigation ("FBI") informally requested the Malaysian police to deport Hiya from Malaysia to the United States. *See* Ex. G at 4-5, 20-21, 32, *United States v. Hiya*, No. 24-CR-00282 (JAV) (SN) (S.D.N.Y.),[2] Criminal Dkt. No. 45-7.

On May 6, 2024, a grand jury in this District returned an indictment charging Hiya with one count of unlawfully applying for and attempting to procure United State citizenship and one count of conspiracy to commit the same. Criminal Dkt. No. 2. That same day, the Government obtained another arrest warrant for Hiya. Criminal Dkt. No. 4.

On May 13, 2024, the Malaysian police brought Hiya to the Sultan Abdul Aziz Shah Airport, "deported" him, and transferred custody of him to FBI agents. Extradition Dkt. No. 20-27 at 1. FBI agents then arrested Hiya pursuant to the May 6 arrest warrant and escorted him onto an airplane bound for the United States. *See id.* at 1-2. More specifically, Defendant alleges that Malaysian police brought him into a bathroom at the airport where FBI agents strip-searched him and administered medical tests; placed him in handcuffs, headphones, and a blindfold; and then escorted him onto a plane where they questioned him about his ties with Israel, but not about the passport fraud charges. Extradition Dkt. No. 20-19, ¶¶ 11-13.

---

[2] The Court refers to this case as the "Passport Fraud Case" and cites its docket entries as "Criminal Dkt. No."

After arriving in the United States, FBI agents transported Hiya to the Metropolitan Detention Center ("MDC") in Brooklyn, New York. Extradition Dkt. No. 20-27 at 3-4. On May 14, 2024, he was presented for an initial appearance in connection with the Passport Fraud Case and subsequently detained. Criminal Dkt. No. 5.

On May 17, 2024, the Government filed a complaint seeking an arrest warrant for Hiya under the U.S.-Israel Extradition Treaty. Extradition Dkt. No. 1. That same day, an arrest warrant for Hiya was issued, Extradition Dkt. No. 2, and thereafter executed on May 20, 2026, Extradition Dkt. No. 5 at 2.

The Passport Fraud Case and the Extradition Case thus proceeded simultaneously. Concerning the Passport Fraud Case, Hiya ultimately pleaded guilty on November 5, 2025, Criminal Dkt. No. 108, and was sentenced on February 6, 2026, *see* Criminal Dkt. No. 111.

Separately, as relevant to the Extradition Case, Israel formally requested Hiya's extradition through a diplomatic note dated June 25, 2024, and addressed to the United States Department of State (the "Extradition Request"). ECF No. 31-1 at 1-4, 46-59. Israel explained that it sought Hiya's extradition pursuant to the U.S.-Israel Extradition Treaty to prosecute him for multiple offenses relating to alleged gang warfare in Israel, including Attempted Murder, Conspiracy to Commit a Felony, Carrying and Transporting Weapon, Changing Identity of a Vehicle or of a Vehicle Part, and Destroying Evidence (collectively, the "Extradition Charges"). *See*

*id.* at 46-59.  On July 19, 2024, the Government submitted the Extradition Request to the Extradition Court.  Extradition Dkt. No. 13.

On December 9, 2024, the Extradition Court held an evidentiary hearing pursuant to 18 U.S.C. § 3184 and heard oral argument.  *See generally* Extradition Dkt. No. 30.  On June 23, 2025, the Extradition Court certified Hiya for extradition to Israel.  *In re Extradition of Hiya*, 2025 WL 1730228, at *14.

## LEGAL STANDARDS

"In the United States, extradition is governed by the federal extradition statute."  *Cheung v. United States*, 213 F.3d 82, 87 (2d Cir. 2000) (citing 18 U.S.C. §§ 3181-96).  Under Section 3184, a judicial officer has the limited task of determining whether there is sufficient evidence "to sustain the charge under the provisions of the proper treaty or convention."  18 U.S.C. § 3184.  Accordingly, at an extradition hearing, "[t]he [court's] inquiry is confined to the following:  whether a valid treaty exists; whether the crime charged is covered by the relevant treaty; and whether the evidence marshaled in support of the complaint for extradition is sufficient under the applicable standard of proof."  *Cheung*, 213 F.3d at 88.

An extradition hearing "is not the occasion for an adjudication of guilt or innocence," but rather, "it is essentially a preliminary examination to determine whether a case is made out which will justify the holding of the accused and his surrender to the demanding nation."  *Skaftouros v. United States*, 667 F.3d 144, 155 (2d Cir. 2011) (cleaned up).  "If the court finds that the request falls within the treaty and satisfies the Extradition Statute, it must issue a certificate of

5

extraditability to the Secretary of State, who makes the ultimate decision whether to extradite the individual." *Hyuk Kee Yoo v. United States*, No. 21-CV-06184 (CS), 2021 WL 5054726, at *3 (S.D.N.Y. Nov. 1, 2021) (citing 18 U.S.C. § 3184), *aff'd*, 43 F.4th 64 (2d Cir. 2022).

Because the extradition court's "certificate of extraditability does not adjudicate the person's guilt or innocence, but serves only to insure that his culpability will be determined in another and, in this instance, a foreign forum, it is not considered a final order that can be appealed directly under 28 U.S.C. § 1291." *Kapoor v. DeMarco*, 132 F.4th 595, 601 (2d Cir. 2025) (cleaned up). Instead, a certificate "of extraditability is subject only to limited review through a habeas proceeding" under 28 U.S.C. § 2241. *Id.*; *accord Skaftouros*, 667 F.3d at 157.

"[H]abeas corpus is not a writ of error, and it is not a means of rehearing what the [extradition court] already has decided." *Lalama Gomez v. United States*, 140 F.4th 49, 54 (2d Cir. 2025) (cleaned up). "In reviewing a habeas petition in the extradition context, a district court may consider only (1) whether the [extradition court] had jurisdiction; (2) whether the offense charged is extraditable under the relevant treaty; and (3) whether the evidence presented by the [G]overnment established probable cause to extradite." *Id.* (cleaned up).

Since the extradition court's judgment is "accord[ed] a presumption of validity . . . on collateral review, it is the petitioner who bears the burden of proving that he is being held contrary to law." *Skaftouros*, 667 F.3d at 158. The petitioner must satisfy this burden through "pro[of] by a preponderance of the evidence that

6

he is in custody in violation of the Constitution or laws or treaties of the United States, which, in this context, will typically mean in violation of the federal extradition statute, 18 U.S.C. § 3184, or the applicable extradition treaty." *Id.* (cleaned up).

## DISCUSSION

Hiya repeats the same three arguments that he originally raised in opposition to the certification of extraditability before the Magistrate Judge: (1) the Extradition Court lacked jurisdiction because the Government's conduct in obtaining custody of Hiya violated his due process rights; (2) the Extradition Court lacked jurisdiction because the Government procured Hiya's presence in the United States by violating the Extradition Treaty Between the Government of the United States of America and the Government of Malaysia (the "U.S.-Malaysia Extradition Treaty"); and (3) Israel's Extradition Request failed to establish probable cause that Hiya committed the charged offenses. *See* Pet. at 11-28. Because each of these arguments lacks merit, the Court denies the Petition.

### A.  Jurisdiction

The federal extradition statute provides that a court has jurisdiction over a fugitive "found within" its jurisdictional boundaries. 18 U.S.C. § 3184 ("[A] magistrate judge . . . may, upon complaint made under oath, charg[e] any person found within his jurisdiction, . . . issue his warrant for the apprehension of the person so charged[.]"). Hiya contends that he was not properly "found within" the Southern District of New York, as his presence in the District (and in the United

7

States) was procured in violation of his due process rights and of the U.S.-Malaysia Extradition Treaty.  The Court considers each of these arguments in turn.

**1.      Hiya's Due Process Rights**

Hiya principally contends that he was only found in the United States as a result of the "deceitful and shocking" misconduct of federal law enforcement officials.  Pet. at 14.  Hiya argues that these due process violations divested the Extradition Court of jurisdiction to certify his extraditability.  *Id.*  Hiya acknowledges that there is a dearth of precedent addressing challenges to a judicial officer's exercise of jurisdiction under Section 3184 based upon misconduct by the federal government in securing the individual's presence in the United States in circumstances like his own.  *Id.* at 15.  There is, however, an ample body of caselaw which addresses the exercise of federal court jurisdiction over criminal defendants whose appearance in the United States was acquired through law enforcement overreach or violation of law.  A discussion of the *Ker-Frisbie* doctrine is therefore in order.

**a.      *Ker-Frisbie* Doctrine**

"[U]nder the so-called *Ker–Frisbie* doctrine, the government's power to prosecute a defendant is not impaired by the illegality of the method by which it acquires control over him."  *United States v. Bout*, 731 F.3d 233, 240 (2d Cir. 2013) (cleaned up).  In other words, "the manner in which a defendant was brought into the United States d[oes] not affect the court's power to proceed."  *United States ex rel. Lujan v. Gengler*, 510 F.2d 62, 64 (2d Cir. 1975).  Forcible abduction by

government officers, for example, cannot support a jurisdictional challenge. *United States v. Umeh*, 527 F. App'x 57, 63-64 (2d Cir. 2013) (summary order); *see United States v. Alvarez-Machain*, 504 U.S. 655, 662 (1992) (holding that, despite defendant's forcible abduction from Mexico by United States agents, "the court need not inquire as to how respondent came before it").  This principle applies even where the criminal statute at issue requires that the defendant be "found in" the United States.  *See, e.g., United States v. Shibin*, 722 F.3d 233, 244 (4th Cir. 2013) ("We conclude that Shibin's presence in the United States, although against his will, satisfied the personal jurisdiction requirements of 'brought into' or 'found in,' as contained in 18 U.S.C. §§ 1651, 1203, and 2280."); *United States v. Yunis*, 924 F.2d 1086, 1092 (D.C. Cir. 1991) ("[T]he statutory term 'found in the United States' . . . does not indicate [a] voluntariness limitation[.]").

Nonetheless, in *United States v. Toscanino*, the Second Circuit recognized an exception to the *Ker-Frisbie* doctrine.  In *Toscanino*, the defendant alleged that he was lured from his home in Uruguay to a deserted area by a paid agent of the United States, violently abducted and smuggled across the Brazilian border, brutally tortured and interrogated for seventeen days with the knowledge and participation of United States officials, and then drugged and placed on a flight to the United States.  500 F.2d 267, 269-70 (2d Cir. 1974), *abrogated on other grounds by, In re Terrorist Bombings of U.S. Embassies in East Africa*, 522 F.3d 157, 167 (2d Cir. 2008).  Faced with such gruesome allegations, the Second Circuit carved out an exception to the *Ker-Frisbie* doctrine where the "conduct of law enforcement agents

9

is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *Id.* at 274 (quoting *United States v. Russell*, 411 U.S. 423, 431-32 (1973) (citing *Rochin v. California*, 342 U.S. 165 (1952))). In such circumstances, a court must "divest itself of jurisdiction over the person of a defendant where it has been acquired as the result of the government's deliberate, unnecessary[,] and unreasonable invasion of the accused's constitutional rights." *Id.* at 275.

Less than one year later, however, in *United States ex rel. Lujan v. Gengler*, "the Second Circuit backed away from the broad holding of *Toscanino*, essentially restricting it to its facts." *United States v. Yousef*, No. 08-CR-01213 (JFK), 2011 WL 2899244, at *7 (S.D.N.Y. June 30, 2011). In *Lujan*, the defendant alleged that he was lured from Argentina to Bolivia under false pretenses, taken into custody by Bolivian police acting as paid U.S. agents, denied all communications with counsel and family, and placed on a plane to the United States. 510 F.2d at 63. Considering these allegations, the Second Circuit drew a line between *Lujan* and *Toscanino*, recognizing "that, absent a set of incidents like that in *Toscanino*, not every violation by prosecution or police is so egregious that *Rochin* and its progeny requires nullification of the indictment." *Id.* at 66. Accordingly, while "*Ker* and *Frisbie* no longer provided a carte blanche to government agents bringing defendants from abroad to the United States by the use of torture, brutality[,] and similar outrageous conduct," the Second Circuit disavowed the "suggest[ion] that any irregularity in the circumstances of a defendant's arrival in the jurisdiction

10

would vitiate the proceedings of the criminal court." *Id.* at 65. The Second Circuit thus distinguished between "an abduction which is simply illegal," as in *Lujan*, and a "complex of shocking governmental conduct . . . [that] sinks to a violation of due process," as in *Toscanino*. *Id.* at 66.

Several years later, the Second Circuit further embraced the distinction between *Lujan* and *Toscanino* in *United States v. Reed*. In *Reed*, the defendant alleged that he was lured onto a plane in the Bahamas by agents from the Central Intelligence Agency ("CIA"), forced to lie on the floor with "a cocked gun to his head" as the agents "threaten[ed] to blow his brains out" during the flight, and then had his arm twisted as he was handed off to FBI agents when he arrived in the United States. 639 F.2d 896, 900-01 (2d Cir. 1981). Noting these allegations, the Second Circuit held that "[t]he instant case falls on the *Lujan* side of the balance rather than on the *Toscanino* side" because "[h]ere, as in *Lujan*, there was none of the cruel, inhuman and outrageous treatment allegedly suffered by Toscanino." *Id.* at 901-02 (cleaned up). Accordingly, "the alleged circumstances of Reed's arrest d[id] not sink to the level of a violation of due process." *Id.* at 902.

Moreover, the exception to the *Ker-Frisbie* doctrine carved out by *Toscanino* has since been challenged. Indeed, "the Supreme Court has reaffirmed the vitality of the *Ker–Frisbie* doctrine no less than five times" in the years following *Toscanino*. *Yousef*, 2011 WL 2899244, at *7 (collecting cases). Other "circuits have called into question *Toscanino*['s] viability in light of the barrage of Supreme Court case law to the contrary." *Id.* (collecting cases). The Second Circuit itself has noted that the

11

premise of *Toscanino* has "been undermined by subsequent decisions of the

Supreme Court." *Umeh*, 527 F. App'x at 64. And "[e]ven district courts in this

[C]ircuit have declined to follow *Toscanino*." *Yousef*, 2011 WL 2899244, at *7

(collecting cases).

###### b.  Application

The Extradition Court held that the *Ker-Frisbie* doctrine supplies the

applicable standard for evaluating Hiya's due process claim. 2025 WL 1730228, at

*11. Based on the record created during the evidentiary hearing, the Extradition

Court found that:

> The Government appears to have deliberately omitted
> information from documents provided to an ally nation;
> backdated documents to create the impression that a
> United States request for deportation existed at a time
> when it did not; and then effectuated the removal of a
> United States citizen from a foreign nation under
> conditions akin to a kidnapping[.]

*Id.* Yet Hiya's allegations of misconduct did not rise to the level of "literal torture,"

as required by *Toscanino* and its progeny. *Id.* The Extradition Court therefore

concluded that it was not divested of jurisdiction. *Id.*

This holding was undoubtedly correct. Under the *Toscanino* standard, the

Government misconduct to which Hiya was allegedly subjected fails to constitute

conduct "so outrageous" that it violated Hiya's due process rights. Here, similar to

the defendants' allegations in *Reed* and *Lujan*, Hiya was—if his allegations are

true—forcibly abducted at the instigation of the United States Government. *See*

Pet. at 2-10. Unlike the defendant's allegations in *Toscanino*, however, Hiya

nowhere alleges that he was subjected to torture, brutality, or similarly outrageous conduct that might warrant divestiture of jurisdiction.  *See id.* at 2-10, 19-20.

Hiya challenges the Extradition Court's holding that the only outrageous conduct that creates an exception to the *Ker-Frisbie* doctrine is physical torture.  *Id.* at 19.  Hiya concedes that a "defendant's forcible detention and rendition to the United States, standing alone, are insufficient to show a due process violation," but speculates that "forcible kidnapping *combined* with other illegal conduct—such as fabricating evidence and attempting to mislead the extradition court, as occurred here"—could meet the requisite standard.  *Id.* at 19-20.  The Court is not convinced, as such an argument runs directly counter to the Second Circuit's admonition that "police brutality and lawlessness involved in obtaining jurisdiction over [a] defendant [is] almost wholly immune from judicial scrutiny."  *Lujan*, 510 F.2d at 64 (cleaned up); *see also United States v. Noorzai*, 545 F. Supp. 2d 346, 352 (S.D.N.Y. 2008) ("Defendant's allegations of deceit and government misconduct, which do not implicate physical abuse of any kind, are insufficient to provide any basis for refusal to entertain this prosecution on due process grounds.").  Even assuming Hiya's allegations are true—which, on the record before the Court, is unclear, *see* Extradition Dkt. No. 36—and even assuming that *Toscanino* is of continuing validity, Hiya's claim fails to approach the extreme abuses that gave rise to the narrow exception recognized in *Toscanino*.  *Lujan*, 510 F.2d at 66.

Rather than waste much ink on attempting to fit within the *Toscanino* exception, Hiya principally argues that the *Ker-Frisbie* doctrine is not applicable in

13

a Section 3184 extradition proceeding.  Pet. at 17-18.  Hiya points out that the doctrine was developed in the context of "extradition-in" cases (where defendants are brought into the United States from another country for criminal prosecution domestically), while his case presents an "extradition-out" scenario (where he was brought into the United States in order to extradite him to another country for prosecution there).  *Id.*  Hiya urges the Court to follow *In re Extradition of Atta*, No. 87-MJ-00551 (JLC), 1988 WL 66866 (E.D.N.Y. June 17, 1988) ("*Atta I*").  *See* Pet. at 15, 18.  In *Atta I*, Magistrate Judge Caden denied certification of extraditability to Israel because, *inter alia*, he "was brought to the United States unlawfully . . . for the sole purpose of returning him for extradition to Israel," and therefore, considering "[t]he limited process which a defendant can take advantage of in an extradition setting," the court lacked jurisdiction because certifying the defendant's extraditability would "violate due process."  1988 WL 66866, at \*19-22.  In doing so, Magistrate Judge Caden distinguished the *Toscanino* line of cases on the grounds that, unlike a defendant who is "forcibly abducted" to stand trial in the United States, "[i]n an extradition proceeding designed to send the defendant out of the United States, the court cannot assure the accused will receive due process."  *Id.*

Yet *Atta I*'s holding has been repeatedly rejected by other courts within this Circuit.  Following *Atta I*, the Government filed a second extradition complaint against the defendant seeking a *de novo* extradition hearing.  *In re Extradition of Atta*, 706 F. Supp. 1032, 1036 (E.D.N.Y. 1989) ("*Atta II*").  After the Government introduced additional evidence that had not been before Magistrate Judge Caden in

14

*Atta I*, Judge Korman held that the relator had not been brought to the United States unlawfully, and so there was no jurisdictional issue.  *See id.* at 1036-37. Judge Korman, relying on the *Ker-Frisbie* doctrine, further elaborated that "[t]he decision of the Magistrate to 'divest' himself of jurisdiction . . . was erroneous as a matter of law even on the record before him" under the *Ker-Frisbie* doctrine.  *Id.* at 1037.

Judge Korman also noted that Magistrate Judge Caden's concern about the differences in process afforded a criminal defendant and a relator in an extradition proceeding was answered by the Supreme Court's decision in *Immigration and Naturalization Service v. Lopez–Mendoza.  Id.* at 1038.  In *Lopez-Mendoza*, the Supreme Court rejected the application of an "exclusionary rule" in the deportation context, reaffirming that "the body or identity of a defendant or respondent in a criminal *or civil proceeding* is never itself suppressible as a fruit of unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred." 468 U.S. 1032, 1039-40 (1984) (emphasis added) (cleaned up).  Referring to the holding in *Lopez-Mendoza*, Judge Korman concluded:

> This holding is a complete answer to the Magistrate's conclusion that the limited process which a defendant can take advantage of in an extradition proceeding is not sufficient to overcome any defect in the procedure which brought him to the United States.  The process afforded in a deportation hearing is as limited, if not more so, than that afforded in an extradition proceeding.

*Atta II*, 706 F. Supp. at 1038 n.4 (cleaned up).

The *Atta* relator then sought a writ of habeas corpus, which was denied. *Ahmad v. Wigen*, 726 F. Supp. 389, 420 (E.D.N.Y. 1989), *aff'd*, 910 F.2d 1063 (2d Cir. 1990). Judge Weinstein agreed that the *Toscanino* standard applied to the petitioner's due process claims in that extradition-out proceeding. *Id.* at 398. Judge Weinstein thus concluded that the petitioner's allegations of abduction and law enforcement misconduct, even if credited, were "insufficient as a matter of law to divest this court of jurisdiction." *Id.*

Finally, on appeal, the Second Circuit affirmed, holding that "the Government's conduct violated neither the Constitution nor established principles of international law." *Ahmad*, 910 F.2d at 1065-66. In doing so, the Second Circuit cited the portions of *Reed* and *Lujan* that applied the *Toscanino* standard. *Id.* (citing *Reed*, 639 F.2d at 901-02; *Lujan*, 510 F.2d at 65-68).

Although this endorsement of the *Toscanino* standard in the "extradition-out" context is not as explicit as Hiya would prefer, *see* Pet. at 16-18, the Court agrees with the Extradition Court that the Second Circuit's "reliance on *Reed* and *Lujan* implies that the [applicable due process] standard is the extremely high one set forth in *Toscanino*," *In re Extradition of Hiya*, 2025 WL 1730228, at *11. Bound by precedent, the Court declines Hiya's invitation to apply a different standard.

### 2.    The U.S.-Malaysia Extradition Treaty

As to his second jurisdictional argument, Hiya contends that the Government violated its obligation under Article 16 of the U.S.-Malaysia Extradition Treaty by withholding information from Malaysia to obtain Malaysia's consent to Hiya's

16

rendition.  Pet. at 20.  Article 16 of the U.S.-Malaysia Extradition Treaty provides, "A person extradited under this Treaty shall not be extradited to a third state for an offense committed prior to his surrender unless the surrendering state consents." Extradition Treaty, U.S.-Malay., art. 16(2), Aug. 3, 1995, T.I.A.S. 97-602, S. Treaty Doc. No. 104-26 (1996).  According to Hiya, federal law enforcement officials deliberately omitted from their communications with the Malaysian authorities information regarding Hiya's connection with Israel, including the pending criminal charges in Israel and the intention of the United States to seek his extradition to Israel.  Pet. at 20.

As an initial matter, to the extent that Hiya suggests that the Government procured his custody from Malaysia on pretextual grounds, it is undisputed that Hiya was indicted by a grand jury in this District in the Passport Fraud Case, that upon his arrival in the United States the United States pursued those criminal charges against Hiya, and Hiya ultimately pled guilty to unlawful application for and attempted procurement of United States citizenship.  *See* Criminal Dkt. No. 111.

More fundamentally, Hiya was not extradited from Malaysia.  Malaysia surrendered Hiya to the United States outside the confines of the U.S.-Malaysia Extradition Treaty.  *See* Extradition Dkt. No. 20-27 at 1-2; *see generally* Criminal Dkt. No. 45-7.  Accordingly, the Government's obligations under that extradition treaty are inapposite for jurisdictional purposes.  *See, e.g., United States v. Herbert*, 313 F. Supp. 2d 324, 328 (S.D.N.Y. 2004) (denying motion to dismiss indictment

17

because "[the defendant] was not transferred to United States custody pursuant to the extradition request of the U.S. authorities, and thus he cannot raise a violation of the extradition treaty as an obstacle to this Court's jurisdiction"); *United States v. Vega*, No. 07-CR-00707 (ARR), 2012 WL 1925876, at *8 (E.D.N.Y. May 24, 2012) ("When a criminal defendant waives extradition, or when the requested country voluntarily transfers a defendant to the requesting country without following the formal procedures of the treaty, the defendant has not been 'extradited' under that treaty.  Moreover, where a defendant is not transferred pursuant to an extradition treaty, he cannot assert any rights conferred by the treaty.  Thus, a criminal defendant's surrender to United States jurisdiction or a requested country's voluntary transfer of a defendant's custody forecloses a rule of [specialty] defense." (cleaned up)); *see also Kapoor*, 132 F.4th at 600 n.7 ("[I]f the person *waives* extradition, then she is transferred to the requesting state outside the extradition process.  The benefit to the person sought is usually a much speedier transfer to the requesting state; the downside to her is that the rule of specialty and any other treaty protections do not apply.").

The Extradition Court similarly did not reach the substance of Hiya's arguments regarding a purported violation of the U.S.-Malaysia Extradition Treaty, but on different grounds.  Relying upon *United States v. Barinas*, 865 F.3d 99 (2d Cir. 2017), the Extradition Court held that Hiya lacked standing to raise treaty violations absent a protest from Malaysia.  *In re Extradition of Hiya*, 2025 WL 1730228, at *8.  Hiya agrees that this is a correct reading of Second Circuit

18

precedent but contends that *Barinas* conflicts with Supreme Court precedent. Pet. at 20-22. Invoking *Alvarez-Machain*, 504 U.S. 655 (1992), and *United States v. Rauscher*, 119 U.S. 407 (1886), Hiya argues that Malaysia's protest is not required for him to assert the rule of specialty under the U.S.-Malaysia Extradition Treaty. Pet. at 21-22.

As stated above, the Court need not reach this argument because Hiya was not extradited under the auspices of the treaty, and its terms are therefore inapplicable. Additionally, Hiya waived this argument before the Extradition Court, where he "clarifie[d] that he [was] not invok[ing] a violation of the U.S.-Malaysia Extradition Treaty under the rule of specialty." *In re Extradition of Hiya*, 2025 WL 1730228, at *7 (citing Extradition Dkt. No. 20 at 18 n.5). Thus, the issue as Hiya frames it here, *see* Pet. at 20-22, was not before the Extradition Court.

Nor did the Extradition Court err in relying on *Barinas*. Second Circuit precedent binds the Court "unless and until its rationale is overruled, implicitly or expressly, by the Supreme Court or [the Second Circuit]." *United States v. Polouizzi*, 564 F.3d 142, 160 (2d Cir. 2009) (citation omitted). Indeed, "[r]espect for the overall structure of the federal judiciary requires that district courts proceed cautiously in deciding whether an intervening Supreme Court decision overrules Second Circuit precedent." *United States v. Williams*, 701 F. Supp. 3d 257, 269 (S.D.N.Y. 2023) (cleaned up). "District courts are therefore obliged to follow that precedent until Supreme Court precedent renders it untenable." *Id.* (cleaned up). Hiya does not point to any intervening Supreme Court precedent that calls into

19

question the validity of *Barinas*.  Rather, he relies on Supreme Court cases that not only preceded *Barinas*, but that *Barinas* itself cited as authority.  *See* 865 F.3d at 104.  This Court, like the Extradition Court, is thus bound by that precedent.

## B.      Probable Cause

Finally, Hiya argues that the Extradition Court erred in holding that Israel's Extradition Request provided probable cause that he committed the alleged charges.  Pet. at 22.  Specifically, he contends he has an alibi for certain of the dates set forth in the request, that the testimony of the key witness relied upon by the Israeli prosecutors is unreliable because under the terms of a cooperation agreement that witness was compensated for his testimony against Hiya, and that other evidence does not corroborate the Extradition Charges.  *Id.* at 22-27.  Hiya challenges the Extradition Court's holding that it was barred from considering evidence regarding his alibi and the payments received by the cooperating witness.  *Id.* at 27-28.

When reviewing Hiya's probable cause challenge, the Court must ensure compliance with the U.S.-Israel Extradition Treaty.  *See Skaftouros*, 667 F.3d at 158 ("[I]n order to merit habeas relief in a proceeding seeking collateral review of an extradition order, the petitioner must prove . . . that he is in custody in violation of . . . the applicable extradition treaty.") (cleaned up).  Article V of the U.S.-Israel Extradition Treaty provides, "Extradition shall be granted only if the evidence be found sufficient, according to the laws of the place where the person sought shall be found, . . . to justify his committal for trial if the offense of which he is accused had

20

been committed in that place[.]" ECF No. 31-1 at 8. Certifying a defendant's extraditability under the U.S.-Israel Extradition Treaty thus requires "evidence sufficient to establish reasonable or probable cause" as to the charged offense in the Extradition Request. *Shapiro v. Ferrandina*, 478 F.2d 894, 898-905 (2d Cir. 1973) (interpreting and applying the U.S.-Israel Extradition Treaty). "To establish the level of probable cause necessary to certify one for extradition, evidence must be produced that is 'sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt.'" *Spatola v. United States*, 741 F. Supp. 362, 373 (E.D.N.Y. 1990) (cleaned up), *aff'd*, 925 F.2d 615 (2d Cir. 1991).

The Court's review of the Extradition Court's finding of probable cause "is limited and should not be converted into a de novo review of the evidence." *Melia v. United States*, 667 F.2d 300, 302 (2d Cir. 1981). While the Court is not "expected to wield a rubber stamp," the Extradition Court's decision is afforded "a presumption of validity." *Skaftouros*, 667 F.3d at 158. For example, "[t]he credibility of witnesses and the weight to be accorded their testimony is solely within the province of the extraditing magistrate." *Austin v. Healey*, 5 F.3d 598, 605 (2d Cir. 1993) (citation omitted). Ultimately, "[a] magistrate's finding that there is probable cause will not be overturned so long as there is *any* evidence warranting the finding that there was reasonable ground to believe the accused guilty." *Spatola*, 741 F. Supp. at 373 (citing *Collins v. Loisel*, 259 U.S. 309, 315 (1922)); *see also Shapiro*, 478 F.2d at 905 ("The magistrate's function is to determine whether there is 'any'

evidence sufficient to establish reasonable or probable cause[.]" (quoting *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925)).

The Extradition Court correctly held that Israel's Extradition Request provided probable cause that Hiya committed the Extradition Charges. To determine whether probable cause existed, the Extradition Court applied the correct legal standard. *See In re Extradition of Hiya*, 2025 WL 1730228, at *6-7, *12-14. Under that standard, the Extradition Court primarily considered the affidavit of Pnina Levy, the "Senior Deputy A in the Tel Aviv District [Criminal] Attorney's Office" (the "Levy Affidavit"). *Id.* at *12. The Levy Affidavit describes the testimony of informants "A.A"[3] and "B.B." about the alleged plan to murder Musli; seized evidence including getaway vehicles and cellphones containing incriminating photos, videos, and communications; surveillance footage; surveillance reports by Israeli police officers; wiretaps; and opinions of an explosives expert—all of which provides evidence to support Extradition Charges against Hiya. *In re Extradition of Hiya*, 2025 WL 1730228, at 12-13; *see* ECF No. 31-1 at 142-56. Considering this abundance of evidence, the Extradition Court properly held that the evidence established probable cause that Hiya committed the Extradition Charges.

Hiya's arguments to the contrary are meritless. As to the alleged alibi evidence, Pet. at 23-24, the Extradition Court has already explained why the

---

[3] A.A. represents himself as an accomplice in the alleged plan to murder Musli. *See* ECF No. 31-1 at 148-52.

22

evidence itself is not inconsistent with his asserted alibi evidence, *see In re Extradition of Hiya*, 2025 WL 1730228, at \*12 (observing that the supporting affidavit does not state Hiya was present in Tel Aviv on the date in question, but only that Hiya's voice was heard on a recording).  As to whether several other pieces of evidence corroborate A.A.'s testimony, Pet. at 25-27, "[a]s a matter of law, accomplice testimony is sufficient even without corroboration to demonstrate probable cause to certify the accused for extradition," *Ahmad*, 726 F. Supp. at 400 (citing *Eain v. Wilkes*, 641 F.2d 504, 510 & n.5 (7th Cir. 1981)).  Since "the weight to be accorded [to such] testimony is solely within the province of the extraditing magistrate," *Austin*, 5 F.3d at 605 (cleaned up), the Court need not address Hiya's challenge further.

Finally, as to whether evidence was erroneously barred, Pet. at 27-28, the Extradition Court was correct to exclude certain pieces of evidence, *Messina v. United States*, 728 F.2d 77, 80 (2d Cir. 1984) ("In the exercise of the extraditing judge's discretion, a fugitive may be permitted to offer explanatory testimony, but may not offer proof which contradicts that of the demanding country.").  The Extradition Court did not err in holding that Hiya may not introduce evidence that attacks witness credibility, *see In re Extradition of Hiya*, 2025 WL 1730228, at \*13 (collecting cases); *see, e.g.*, *In re Extradition of Vukcevic*, No. 95-MJ-1176 (MHD), 1995 WL 675493, at \*7 (S.D.N.Y. Nov. 14, 1995) ("First, as a general matter, the defendant cannot challenge the credibility of government witnesses or evidence in an extradition hearing.").  Regardless, "the 'wrongful exclusion of specific pieces of

23

evidence, however important, does not render the detention illegal.'" *Messina*, 728 F.2d at 80 (quoting *Collins*, 259 U.S. at 316). The Court thus rejects Hiya's probable cause challenge and denies his petition for a writ of habeas corpus.

## C.    Motion to Stay

Hiya requests that, if his habeas petition is denied, the Court issue a stay of its decision so that he may pursue an appeal to the Second Circuit. ECF No. 36 ("Reply") at 7. Courts consider four factors when assessing a motion for a stay pending appeal: (1) the movant's "strong showing that he is likely to succeed on the merits"; (2) "irreparable injury to the [movant] in the absence of a stay"; (3) "substantial injury to the nonmoving party if a stay is issued"; and (4) "the public interest." *New York v. United States Dep't of Homeland Sec.*, 974 F.3d 210, 214 (2d Cir. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)). "The first two factors are the most critical, but a stay 'is not a matter of right, even if irreparable injury might otherwise result[.]'" *Id.* (quoting *Nken*, 556 U.S. at 434-35). Accordingly, "a stay is 'an exercise of judicial discretion,' and '[t]he party requesting a stay bears the burden of showing that the circumstances justify an exercise of discretion.'" *Id.* (quoting *Nken*, 556 U.S. at 434-35).

The first factor, which considers the likelihood of success on the merits, weighs in favor of denying the stay. Hiya raises the same issues for a potential appeal that he argues in his Petition. *See* Reply at 8. For the reasons discussed *supra*, Hiya fails to making a strong showing that he is likely to succeed on the merits of these issues. This factor thus weighs against Hiya.

The second factor, which considers irreparable harm to the movant in the absence of a stay, weighs in favor of granting the stay.  Indeed, Hiya "would likely be removed from the United States before his appeal is decided." *Hyuk Kee Yoo v. United States*, No. 21-CV-06184 (CS), 2021 WL 6100609, at *2 (S.D.N.Y. Nov. 16, 2021).  Accordingly, this factor favors Hiya's motion.

The third and fourth factors weigh in favor of denying the stay.  "Because the Government is the opposing party, the third and fourth factors (harm to the opposing party and the public interest) merge." *Id.* (citing *Nken*, 556 U.S. at 435).  These factors typically weigh in the Government's favor in the context of extradition proceedings.  *See Artukovic v. Rison*, 784 F.2d 1354, 1356 (9th Cir. 1986) (noting the public's interest in the Government's compliance with a valid extradition application strengthens international relations); *cf. Nken*, 556 U.S. at 436 ("There is always a public interest in prompt execution of removal orders[.]").  These factors therefore weigh against Hiya.

Having weighed the factors, the Court declines to exercise its discretion to grant a stay pending appeal.

## CONCLUSION

Accordingly, the Extradition Court correctly certified the extraditability of Hiya to Israel under the U.S.-Israel Extradition Treaty.  The Petition for a writ of habeas corpus is thus **DENIED**.

Hiya's motion for a stay pending appeal is likewise **DENIED**.  Nonetheless, the Court grants an administrative stay of this opinion and order, to be in effect for

one week from the date of this Order and Opinion, to allow Hiya time to file a motion for a stay in the Second Circuit Court of Appeals.

The Clerk of Court is directed to enter judgment in accordance with this decision, to terminate all pending motions, and to close the case.

SO ORDERED.

Dated:  June 29, 2026
New York, New York

JEANNETTE A. VARGAS
United States District Judge